15 minutes of the plaintiff, 15 minutes to be shared by Mr. Simons, Mr. Preston, or the plaintiff's attorney. Good morning, Your Honors. Good morning. I'm Klein Preston. I represent Mr. William Spann. This is an appeal as of right from the District Court in Middle Tennessee District from a motion to dismiss. The primary basis, Your Honors, respectfully for our appeal is with respect to our Fourth Amendment claim that was dismissed as a 1983 action based upon the actions of some agents for the Tennessee Wildlife Resources Agency who placed cameras, field cameras, on multiple properties of Mr. Spann and had him under constant surveillance with these cameras. Our claim is that this violates his Fourth Amendment right, his expectation of privacy, and that he had a subjective expectation of privacy and that the constant surveillance, which went on for a matter of months, in fact, violated his constitutional rights under the Fourth Amendment and thus since the actions were taken under the color of state law by these agents of the TWRA that constituted a 1983 action. I think we understand that argument. And one can sympathize with your clients being upset having these agents crawling all over his property putting cameras. I mean, I understand that. The problem would seem to be that the Supreme Court's Fourth Amendment cases make a distinction between curtilage and open fields, right? And curtilage, kind of your yard, the area around a dwelling, outside, you have an expectation of privacy there. And this is really trespass theory Fourth Amendment law as opposed to privacy-based. But so you can't have somebody come on the curtilage and, you know, search something or gain information there that they wouldn't be able to just see. They need a search warrant to go on your curtilage. But, I mean, the Court's cases, most recently Jones, Justice Scalia, writing about a trespass theory, said there is no Fourth Amendment protection for open fields. People don't hunt turkeys on curtilage, right? So, I mean, how do you get around this? Well, actually, although I'm not myself a hunter, in parts of Tennessee people do hunt animals on curtilage. But that's not being used. Probably not using a firearm. Yeah. Your Honor, this case is distinguishable from the case such as U.S. v. Van Casteren, the U.S. v. Anderson-Bagshaw, which is out of this Court, and also Jones. Well, not Jones, but it's distinguishable because in this instance, when you look at how the surveillance was conducted in each of these cases, you had agents who either through AT&T or some other way, they placed cameras that only gave the ability to observe what an officer could have observed otherwise. And so in the, I believe it is the— In those cases you're talking about? Yes, sir. Again, though, the problem is the Court just says you don't have any Fourth Amendment protection, period, in open fields. There just isn't any. So if these cameras were placed in open fields, which is where the hunting was going on, then there's just no Fourth Amendment protection, period. And it doesn't seem like your complaint would give the District Court any reason to think that where this turkey hunting is going on, is curtilage rather than open fields. It would facially obviously seem to be open fields, and the complaint doesn't give us any reason to think otherwise. And so I'm kind of struggling to see why the District Court was wrong to say it did not state a Fourth Amendment claim as to the cameras. Well, as we know under CATS, Fourth Amendment applies to the person and not to the place. And I do understand— What? I'm not familiar with that. I mean, are you talking about searching someone's person? Well, in this instance, Your Honor, this is distinguishable because Mr. Spann had three properties. These agents trespassed on his property. They placed multiple cameras that were under constant surveillance. So if you look at the scenario like in Jones that had to do with the GPS being constant, that same idea is applicable here, Your Honor. Now, Jones was about all the information that is revealed by your movements. That's not this case. I understand with respect to—it is a different technology. But Mr. Spann respectfully admits that we should have—he should have an expectation of privacy on his own property that is not—and there is no proof in the record that any of these locations were visible from another property, from a road, I guess from any other. Yeah, okay. I mean, I'll relent. I mean, I'm just telling you the Fourth Amendment doesn't protect open fields. It doesn't matter if people can see him. It doesn't matter if he had an expectation of privacy. You're out of luck if it's open fields is my understanding of the law. Well, and, Your Honor, with respect to the recent cases such as the one that the state cited again, I'll submit that there's a distinction because when you read the cases that deal with open fields, almost always it's a scenario in which the law enforcement agent uses either a public utility or places cameras that are off the property. Where that's understandable in open fields, but in this case it's distinguishable because these cameras were placed in multiple places. I mean, that's a thoughtful argument. I mean—go ahead. So the cameras you're saying somebody entered onto his open fields and placed cameras there. Yes. That's exactly what law enforcement agents, the TWRA agents, did with the assistance of one of his employees, Mr. Southerland. And they placed these cameras, which were—he was under constant surveillance with these. These field cameras operate based on movement. Sure. Like a trail camera. That's exactly what they were. Sure as a stand to use them to take pictures of the bucks walking by. You're exactly right. So do you have any cases that say that that's impermissible where it's not part of the cartilage? No. But when you analyze what the language of each of these cases, they all deal with how the surveillance was conducted. And almost all the cases, whether it be Anderson-Bagshaw or the Banka-Steering case, they all deal with the observation. And the language is repetitive. The observation that an officer could have ordinarily had anyway. And so if they're driving down the road and they're looking, I mean, obviously you don't have any expectation of the process. But that would be more like plain view than open field. So you say it's basically the same doctrine? I think, yes, Your Honor. I mean, the way the cases that deal with open fields are, they all have to do with obtaining surveillance through a position that they could have had even if an officer had been standing there all day long surveilling a potential party. But in this case, the difference is the officers could not have been in these locations without breaking the law for a continuous period of time. I guess, OK, I think we got that part of the argument. How did this all get started? I mean, you say your client harvests and stalks this, quote, monster buck in Kansas. I mean, what was the problem that started this whole sequence of kind of strange? What started the sequence was Mr. Spann harvested a buck in Kansas on property that he had a lease on. He bought a license. What was the federal violation? It was a lacing violation because he hunted under the wrong license. What was the wrong license? It was a license in Kansas where he was supposed to have farmed the property, not just had a lease on it. He had not farmed it. And they chased him for that, huh? They chased him for that. And then from there, that's how this – And then he brought it across state lines. He brought it across state lines. So something that could be the lowest misdemeanor in the state code, if you cross a line, you're now a felon. And that's how this started. He did not enter a plea to the Lacey Act. He entered a misdemeanor plea to a lesser included. But from that, the constant surveillance arose. Right. And the court – I mean, I know that this isn't properly before you, but the circuit court, the criminal court in Tennessee just suppressed 2 million photographs based on this exact argument. Okay. Well, if we're not talking about something in our record, we better not talk about it. Okay. You'll have your rebuttal. We're going to hear from folks on the other side. Is this good? Sure. Okay. Yeah. I'm a little soft-spoken, so I want to make sure I'm talking to you. That's all right. You can move it however you need to. Okay. Good morning, Your Honors. My name is Dawn Jordan with the Tennessee Attorney General's Office here on behalf of all defendants except for Thomas Sutherland. There are three reasons to affirm the district court. One, based on plaintiff's own admitted complaint, paragraph 31, the cameras were placed on farms. There's no mention of home or curtilage. Therefore, the Fourth Amendment is not implicated. Two, the February 21, 2014, warrant was for non-fleeting items and was based on information only eight months old, which is well within the time frames that this circuit has allowed for non-drug-related crimes. And three, plaintiff failed to properly plead or allege necessary prerequisites for a Fifth Amendment takings claim. The video surveillance of plaintiff's farms where he conducts his televised and much-photographed hunts did not violate the Fourth Amendment. So, I mean, is this the way it works down in Tennessee? They just go on people's property and start setting up cameras if they want to see what you're doing? I mean, I'll say this. I understand everything you just said. That said, it seems like these agents went totally overboard. I mean, they're pursuing this guy. They're arresting his son. They're harassing his wife. They're ransacking his house on a search. I mean, is this kind of standard operation for how we investigate, you know, somebody didn't have the right license in Kansas? No, Your Honor. There were circumstances here without going outside the record. There were circumstances that were in place. Okay. I mean, it just seems like this explosion of law enforcement activity, highly intrusive, maybe not constitutionally forbidden, you know, based on what? He, you know, uses a crossbow on a buck in Kansas. Yes, and I understand, Your Honor, that there are some misgivings about this perhaps. I just, you know, if you could tell those folks, at least one of us had a concern. I'm sorry. And I understand that. Thank you, Your Honor. But like I said, without going outside the record, there are reasons for it, and so I can't articulate that. Okay, that's fair. We're based on the complaint. For good, the Kats v. United States plaintiff has no reasonable expectation of privacy in what he knowingly exposes to the public, and in this case, his farms, which are well televised. But you think it's exposed to the public. I mean, you're not saying that somebody could see this area standing outside the property, are you? And not necessarily, Your Honor, but that does not matter. In U.S. v. Oliver, that was a case in which officers did go past a no trespassing sign and entered the field. That was at issue. And in that court, which is the seminal case on open fields doctrine, the court found that there was no Fourth Amendment violation because an open field is not protected. An open field is a bit of a misnomer. It just means an area that is not within the home or the curtilage. It can be a forest. It could be an open field. It can be a farm. It's just not home or curtilage. And the farms are not considered to be open fields, which are subject to Fourth Amendment protections. We've gone over that. U.S. v. Vancousteran, which admittedly is a Fourth Circuit case, but did involve a situation where officers did go onto the property and installed cameras without permission, and they did trespass. The court there found there was no Fourth Amendment violation. But it's because the area isn't protected, not because it's exposed to other people. Right. And that's the open fields doctrine under U.S. v. Oliver and U.S. v. Vancousteran. Did he have a civil action for trespass under Tennessee law? He potentially could, Your Honor. He potentially could, Your Honor, but he did not raise that in this complaint, and he is not sued for that. So that's not before us today. Yeah, I mean, one has a sense that there's something wrongful. I mean, it would probably be a trespass rather than the Constitution being triggered is your argument, I guess. Correct, Your Honor. But that's not before us. That's not before you. There is no trespass claim here. It's just a Fourth Amendment Section 1983 claim that is at issue here. And in the alternative, Your Honors, there is qualified immunity. There was no clearly established right that these defendants violated. Well, let me ask you this. If he was standing on the road and sort of ran around the farm where there was a public path, that would be okay. Then he wouldn't even be here, right? That is correct, Your Honor. So all he's saying is that you can't stand on a farm, private property. My private property or somebody's? Suppose it was somebody else's farm. Well, that's kind of unclear. In his complaint, I'll just leave it at that, he calls them his farms. In the district court case, they are properties to which he either owns or has hunting rights. So it's kind of unclear. But if we're just sticking with the complaint, he calls them farms. The February 21st, 2014 search was proper and not based on still probable cause. Of note, the search warrant was issued one day after plaintiffs had already been indicted for evidence tampering and other crimes, which were related to the items that the defendants were looking at, were wanting to find. The search warrant is 23 pages long and contains a detailed account of the supporting facts. Plaintiff does not take issue with those supporting facts, only takes issue with the timing of the facts, which was eight months prior. We see drug dealing cases all the time where it's like a four-page affidavit, and I don't know what's going on in this case. Did they ever find the phone? I believe that. That I'm not sure of, Your Honor. I know they found other materials, and they did track the phone. Again, we're getting outside the record. I don't necessarily want to do that, but they did track the phone while he was in his possession using cell towers, which we know for U.S. v. Carpenter, which Your Honor cited, we know that's proper. Plaintiff's only cited case for this proposition, U.S. v. Suprensky, does not help him. Plaintiff cites only to the dissenting opinion, not to the main opinion, and in Suprensky, this court found that the warrant was reasonable even though what they were searching for was marijuana, which is a well-known fleeting substance, not the case with documents, computers, and cell phones, that kind of thing. And in fact, outside the context of drug crimes, as Your Honor was pointing out, time periods allowed are very generous, and the eight months is well within that time frame. And in addition, there would be qualified immunity. There is no clearly established time frame for stale probable cause, so the defendants would be entitled to qualified immunity for that. Finally, as to Plaintiff's Fifth Amendment takings claim was properly dismissed, Plaintiff is claiming, basing his claim on two allegations in his amended complaint. Paragraph 34, where he claims that Jason Dodson's home was raided and items were seized. Interestingly, in that paragraph, it's not clear whether the items seized were actually belonging to Plaintiff. That's not clear. And the other paragraph is 49, where Plaintiff claims that some of his property was seized from Jones' taxidermy. And in this paragraph, he does specifically claim the property is his. But nowhere in either of these paragraphs or anywhere in the complaint does Plaintiff assert that there is a final agency decision or that he first attempted to seek compensation for the items taken before he filed this complaint. Is part of your argument that the takings clause does not apply to items seized in a criminal investigation? Yes, that is correct, Your Honor, it is. And that takes it out of the Fifth Amendment context and places it into the Fourth Amendment context. And there are no allegations that would support a Fourth Amendment claim. So, I mean, the exhaustion stuff, I mean, if we're going through this step by step, we wouldn't even get there in your view. That is correct, Your Honor. Is there a procedure to get that property taken pursuant to a criminal proceeding? Property that has, it's not contraband, I mean. After the criminal case is over, and as we know the criminal case is over, and as we well know, the criminal case is still proceeding. We know that. He just filed a motion for continuance for that. But beyond that, talking about the Fourth Amendment, the plaintiff did not properly raise the Fourth Amendment claim. He did not claim a reasonable expectation in the items that were seized. They were seized as part of a criminal investigation. And he certainly cannot claim a reasonable expectation of privacy in Jason Dodson's home or in Jones' taxidermy. And if I could, I would like to make a couple of points about the Fifth Amendment takings claim, if I could just go back to that for a moment, Your Honor. To circumvent, to try to circumvent the failure in his pleadings, the plaintiff alleged in response to the motion to dismiss that there was a final agency decision and that there is no procedure for seeking compensation, and cites to 12-1-202 to say that there is no compensation procedure for where property is seized as evidence of a crime. However, 12-1-202 pertains to seizures of real property or improvements to real property. And here what we have are seizures of, are alleged seizures of personal items. So that doesn't even apply. And so the, even in the motion to, in the response to the motion to dismiss, the plaintiff did not properly raise the Fifth Amendment claim. And so for those reasons, we ask that you affirm the district court, unless there are any further questions. Very well. Thank you for your argument. Thank you. And sorry if you couldn't hear me all the time. You did fine. I'm here for Mr. Todd. Is this acceptable heights? Good morning, Your Honors. May it please the court. My name is James Todd. I represent Defendant Thomas Sutherland. I will confess I am a hunter. I am a turkey hunter. I have a little brother who did sneak out past the family barn lot and managed to call in a large turkey. Well, yeah, they come to you, right? About 50 yards from the house. I'm not going to get into the cartilage arguments. It seems that the primary issues in this appeal really do stand between, it's between the TWRA and Mr. Spann. So in that line, I'm going to try to keep things very brief. Your client was a cameraman? A former cameraman of Mr. Spann. Tell me again why he's involved here again. Well, there were originally three claims against Mr. Sutherland that I've been able to point out. I think everybody agrees that after the June 2013 testimony, the probation revocation hearing out in Kansas, there wasn't – Sutherland, there was no – from that point on, it was just the TWRA. Any involvement was basically from that point before. And the allegations that we see against Thomas are the trail cameras or the surveillance cameras. He's involved in setting them up. He knows where his boss – It's alleged in the amended complaint, Your Honor. It's also alleged that the scratch feeder, the bait for the turkeys that was illegally placed on the properties, was placed at the TWRA's direction. He also included in the amended complaint, he amended it, that his testimony in the June 2013 probation revocation proceeding was perjury and was acting in cahoots with the TWRA. But I believe in his amended complaint concedes it's not an actual cause against Sutherland. What I'm really here for is it's well established of the lines that we have with regard to a private party acting under color of state law. On the one hand, you have this full-on conspiracy between a private party and the government, such that the private party has in effect clothed themselves in state law, I think is the terminology we use, versus somebody merely reporting a crime or getting questioned by police and providing that information. And on their face, at least with regard to what we see in this complaint or the amended complaint, you could say that there was some sort of acting cohesion. But that's why we have judicial notice, and that's why we have preclusion principles in this court. He had the opportunity to put on not less than ten witnesses back at these probation revocation proceedings, which had the exact same burden of proof on the state or on either party as what we saw in this district court. And the district court in that case, which we even filed a copy in this case, specifically said, as to the two main points as to Thomas, that it was Spook Spann who directed that scratch fee get put out, not the TWRA. I'm sorry, Spook. I'm from the area where Mr. Spann and Mr. Sutherland lived, and everybody knows him as Spook. That's the name of his television show. It's a big bow-hunting name, I guess would be the phrase. Mr. Spann, or plaintiff, was the one who directed that the scratch fee get put out. It was his direction, not the TWRA's. That's what your client testified, is that what you're saying? That's what was held in that final appealable order in Kansas, which was filed on record in this case, as well as the trail cameras, were placed out by the TWRA, and that Sutherland had no involvement in that whatsoever. Those are the only two that remain as to him. And I thought that was what the entire issue, what the basis of collateral estoppel, judicial estoppel— But why was that important to decision? I mean, the issue was whether he violated his probation. It's not who put the stuff out. Those facts themselves were material to whether he violated the probation. Who put the cameras out? Yes, absolutely. Why? On his property, he was prohibited as a term of his probation from hunting anywhere in the United States for a period of six months. Right. And trail cameras being placed out at the hunting sites by the TWRA officials would, I would think, be part of probationary investigation. I mean, open fields aside, this guy was under probation. And I think we cited the Knights case where you don't even need a warrant if you've got a reasonable suspicion to even enter into somebody's home, much less place a trail camera out on the edge of a farm. I thought you were focusing on who put the cameras there, not— Well, yes, Your Honor. That order from that court was a final appealable order, and those material issues Mr. Spann had the opportunity to litigate extensively. But what difference does it make who put them there to the question of whether he violated his probation? If Thomas Sutherland did not place those trail cameras there, then he didn't even have any involvement at all based on the allegations in the complaint, much less a conspiracy with the state to bring him up to a state act. I'm asking you a different question. In deciding whether Spann violated his probation, what difference would it have made if your client did or did not put the cameras there? It was irrelevant to the question whether Spann violated his probation, wasn't it? The matter as to who actually placed those cameras, I would call it absolutely relevant, but perhaps the materiality would be the ambiguous point with regard to those probation revocation proceedings. Nonetheless, there's multiple points stated where the testimony on record as to who placed those cameras here or there and whatnot. At the very least, it was not a fact disputed. And to manufacture something like allegations which directly contradict that order at this point down the road, it appears to me to run more or less directly afoul of every type of preclusion principle that we operate under. And the same thing is true with the scratch feed as well. But at the same time – have I already gone over? Yes, you have. But if you're having – I'll leave it to Judge White in terms of – Well, putting aside issues of issue preclusion, why is your client – At the very least, Your Honor, even if he was not precluded from developing those facts contradictory to the other district court order, then that would necessarily entail he being held to be a state actor, at which point I think we did in our brief – he would be entitled to the same qualified immunity. At the same time, though, I still briefly argue that his expectations of privacy were severely reduced on his properties as a result of him being under probation. I just – I don't – This seems like a totally collateral issue to our appeal, whether he – I completely agree. I was trying to keep it brief, Your Honor. I'm sorry. That's okay. I don't want to truncate anything. You? It's more just wanting to protect a private party that seems to have kind of been drug into something. I understand. Do you have anything further? All right. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honor. What we're asking the court to do is to reexamine the issue about the open field doctrine. How can we do that? We're talking Supreme Court doctrine here. Well, by looking at – when you look at like U.S. v. Jones, where it involved the constant surveillance, and that was found to be intrusive. Right. In the same instance, when you have – even though it is open fields, the distinction has been drawn in the cases about the access for the open fields. And relating back to your question about, Your Honor, about the plain view, am I saying they're the same doctrine? Why shouldn't they be? Because when the officers in all these cases, whether it be the Banker-Stern or Anderson-Bagwell, when they put out these cameras, the language of these opinions is that it's to essentially do what an officer could have done anyway, just like plain view. Or, you know, the officers in the Anderson-Bagsall case had been driving along the road, and they got tired of their cars being seen. So they went to and put up the camera on a utility pole with AT&T. But this case is similar to Jones because you have over 2 million photographs taken. Not all of them of Mr. Spann, but we're talking about constant surveillance over a long period of time. I understand your argument. I understand. I respectfully submit that there needs to be a dividing line. It's mostly animals walking by, though, right? I mean, it's just triggered by movement, right? It is. So it's like turkeys. It is. And as well as hunting parties, I guess. But I would propose the scenario, what if Mr. Spann, and this does occur. It's not in the complaint. What if Mr. Spann camps out there? Is a tent that he's in, is that not his home for a period of time? I mean, is a home, how do we define a home? I mean, so this is his land. It's for his use. And the constant surveillance distinguishes this from any case that I've been able to find. All the cases that your honors have before you involve a single camera. It's put at some location that is, sometimes it's viewing curtilage, sometimes not. The Houston case, it did view the backyard of the trailer and some of the other properties. Let me ask you a question about your takings claim. Do you agree that property seized during a criminal investigation is not, cannot be the basis of a takings claim while that criminal proceeding is ongoing? I agree if it's properly taken.  Not all. So I know you think there's a Fourth Amendment violation when they took the various things that are the subject of the takings claim. Yes. But, I mean, that's a Fourth Amendment issue that's not a takings issue. Would you agree that to the extent it's seized pursuant to a criminal investigation and the proceeding is ongoing, that you don't have a takings claim as to those items? Only if it is, if they are items that are taken that are relevant to the investigation. What we have here is they went in and raided, they took things that had nothing to do with the investigation. I understand. I mean, you know, you're talking about kids' videos, games are being taken and so on. And I understand your reaction to that. But do you have a case that limits, that says, well, if the items really aren't that important or somehow just sort of not material to the criminal investigation, then you can bring a takings claim if you haven't gotten them back, even though the proceeding is ongoing? No, Your Honor. Okay. I mean, it's a bit of a problem. Go ahead. Are there any state statutes that govern how you get property back or how you can – or court rules for getting property back in a criminal case? I'm sorry. In Tennessee, there's – we have a state forfeiture regime where once they take property, they're supposed to put you on notice. And so there's a whole procedure that we have with respect to forfeitures taking property. But this falls in the middle of that, and there's really not. There's an analogous statute that had to do with real estate, but there's not one that has to do specifically with what happens with that property. And there was no notice or notice of forfeiture under that line of statute. So there isn't any. All right. All right. Thank you, Mr. Preston. Thank you. Appreciate your arguments. Appreciate you coming up here. I think that's it for the case. The case will be submitted. The remaining cases are on briefs. The clerk may adjourn court. The honorable court is adjourned.